# IN THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| **Bank of Blue Valley, a division of HTLF Bank,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | |
| **B&B CAPITAL, LLC**<br>**SERVE AT: Matthew Briegel, Reg. Agent**<br>            **30850 Nottingham Lane,**<br>            **Lawson, MO 64062** | |
| **MATTHEW BRIEGEL**<br>**SERVE AT: 30850 Nottingham Lane,**<br>            **Lawson, MO 64062** | |
| **NATHANIEL YODER**<br>**SERVE AT: 884 SW 1751st Road**<br>            **Garden City, MO 64747** | |
| **ROSE HILL CATTLE COMPANY LLC**<br>**SERVE AT: Matthew Briegel, Reg. Agent**<br>            **30850 Nottingham Lane,**<br>            **Lawson, MO 64062** | |
| **B&B LEGACY, LLC**<br>**SERVE AT: Michael K. McVey, Reg. Agent**<br>            **105 E. Fifth Street, Ste. 500**<br>            **Kansas City, MO 64106** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Bank of Blue Valley, a division of HTLF Bank, formerly known as Morrill & Janes Bank and Trust Company for its Complaint against Defendants B&B Capital, LLC, Matthew Briegel, Nathaniel Yoder, Rose Hill Cattle Company, LLC, and B&B Legacy, LLC, hereby states and alleges as follows:

## Parties

1.      Plaintiff Bank of Blue Valley, formerly known as Morrill & Janes Bank and Trust Company ("Lender" or "Plaintiff") is a division of HTLF Bank, a Colorado corporation whose principal place of business is 1800 Larimer Street, #100, Denver, CO 80202.

2.      Defendant B&B Capital, LLC ("B&B Capital") is a Missouri limited liability company with its principal place of business at 30850 Nottingham Lane, Lawson, MO 64062, and may be served through its registered agent Matthew Briegel at 30850 Nottingham Lane, Lawson, MO 64062.

3.      Defendant Matthew Briegel ("Briegel") is an individual and may be served at 30850 Nottingham Lane, Lawson, MO 64062.

4.      Defendant Nathaniel Yoder ("Yoder") is an individual and may be served at 884 SW 1751st Road, Garden City, MO 64747.

5.      Defendant Rose Hill Cattle Company, LLC ("Rose Hill") is a Missouri limited liability company with its principal place of business at 30850 Nottingham Lane, Lawson, MO 64062, and may be served through its registered agent Matthew Briegel at 30850 Nottingham Lane, Lawson, MO 64062.

6.      Defendant B&B Legacy, LLC ("B&B Legacy") is a Missouri limited liability company with its principal place of business at 30850 Nottingham Lane, Lawson, MO 64062, and may be served through its registered agent Matthew Briegel at 30850 Nottingham Lane, Lawson, MO 64062.

## Jurisdiction and Venue

7.      Plaintiff is a division of HTLF Bank, a Colorado corporation whose principal place of business is in Colorado. Plaintiff is a Colorado citizen.

8.     Briegel is a Missouri citizen.

9.     Yoder is a Missouri citizen.

10.    B&B Capital is a limited liability company whose members are Briegel and Yoder, and accordingly is a Missouri citizen.

11.    Rose Hill is a limited liability company whose members are Briegel and Yoder, and accordingly is a Missouri citizen.

12.    B&B Legacy is a limited liability company whose members are Briegel and Yoder, and accordingly is a Missouri citizen.

13.    The parties are of diverse citizenship (Colorado and Missouri, respectively).

14.    The amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

15.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a).

16.    The events that gave rise to the cause of action alleged in this complaint occurred in said District.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### General Allegations

**A.  *Loan #511407939***

18.    On February 9, 2018, B&B Capital, Briegel, and Yoder (collectively "Borrowers") executed a Promissory Note (the "511407939 Note") payable to Lender in the principal amount of $550,000.  A copy of the 511407939 Note is submitted herewith as **Exhibit 1** and incorporated herein by this reference.

19.    On March 30, 2018, Borrowers executed a Promissory Note (the "First Amended 511407939 Note") payable to Lender in the principal amount of $950,000.  A copy of the First

Amended 511407939 Note is submitted herewith as **Exhibit 2** and incorporated herein by this reference.

20.     On March 30, 2018, B&B Capital executed, acknowledged, and delivered to the Lender, a Deed of Trust (the "Ray County Deed of Trust") on the following described real property to secure payment of the indebtedness owed by them to the Plaintiff:

> All that part of the East half of the Southwest Quarter of Section 31 , Township 54, Range 29, described as follows: Beginning at a point 2,111 feet South and 899.3 feet West of the Northeast corner of said quarter section; thence North 28 degrees 28 minutes East, a distance of 111 feet; thence North 61 degrees 32 minutes West, a distance of 86 feet; thence North 28 degrees 28 minutes East, a distance of 1,000 feet; thence North 61 degrees 32 minutes West, a distance of 14 feet; thence North 28 degrees 28 minutes East, a distance of 185 feet; thence South 61 degrees 32 minutes East, a distance of 300 feet; thence South 28 degrees 28 minutes West, a distance of 1,187.6 feet; thence West, a distance of 227.5 feet to the point of beginning. Together with all perpetual rights and easements for ingress and egress appurtenant to the above described premises or any part thereof.

Commonly known as 624 N Pennsylvania Avenue, Lawson, Missouri (hereinafter referred to as "Ray County Property"). A copy of the Ray County Deed of Trust is submitted herewith as **Exhibit 3** and incorporated herein by this reference.

21.     The Ray County Deed of Trust was duly filed and recorded on April 10, 2018, in the Office of the Recorder of Deeds, Ray County, Missouri, in Book 1941 at Pages 66. *See* **Exhibit 3**.

22.     On March 30, 2018, B&B Capital executed, acknowledged, and delivered to the Lender, an Assignment of Rents (the "Ray County AoR") relating to the Lawson Real Property. A copy of the Ray County AoR is submitted herewith as **Exhibit 4** and incorporated herein by this reference.

23.     The Ray County AoR was duly filed and recorded on April 10, 2018, in the Office of the Recorder of Deeds, Ray County, Missouri, in Book 1941 at Page 67. *See* **Exhibit 4**.

24.     On May 3, 2018, B&B Capital executed, acknowledged, and delivered to the Lender a Modification of Deed of Trust relating to the Ray County Deed of Trust (the "Ray County Modification of Deed of Trust"). A copy of the Ray County Modification of Deed of Trust is submitted herewith as **Exhibit 5** and incorporated herein by this reference.

25.     The Ray County Modification of Deed of Trust was duly filed and recorded on June 22, 2018, in the Office of the Recorder of Deeds, Ray County, Missouri, in Book 1950 at Page 74. *See* **Exhibit 5**.

26.     On March 30, 2018, B&B Capital executed, acknowledged, and delivered to the Lender, a Deed of Trust (the "Cass County Deed of Trust") on the following described real property to secure payment of the indebtedness owed by them to the Plaintiff:

> Tract I: All that part of the West Half of the East Half of the Southwest Quarter of Section 36, Township 44, Range 30, described as follows: Commencing at a point at the Northwest corner of Lot 12, Block 11, of the Original Town of Garden City, Cass County, Missouri, thence North 43 degrees 22 minutes 13 seconds East (Deed = North 41 degrees 27 minutes East) along the Easterly Right-of-way line of 5th Street a distance of 30.00 feet to the centerline of ″D″ Street, said point also being the point of beginning; thence continuing North 43 degrees 22 minutes 13 seconds East (Deed = North 41 degrees 27 minutes East), along the Easterly right-of-way line of 5th Street a distance of 140.00 feet; thence South 46 degrees 37 minutes 50 seconds East a distance of 180.08 feet (Deed =180.00 feet); thence North 43 degrees 20 minutes 41 seconds East a distance of 90.25 feet (Deed = 90.00 feet) to a point on the Southerly right-of-way of Old 7 Highway; thence South 46 degrees 39 minutes 07 seconds East along the Southerly right-of- way Old 7 Highway a distance of 47.87 feet; thence South 43 degrees 20 minutes 41 seconds West a distance of 100.19 feet; thence South 46 degrees 39 minutes 07 seconds East a distance of 60.25 feet; thence South 43 degrees 20 minutes 41 seconds West a distance of 130.00 feet to a point on the Centerline of ″D″ Street: thence North 46 degrees 39 minutes 07 seconds West a distance of 288.26 feet to the point of beginning. All bearings are based on West line of the Southwest Quarter of Section 36, Township 4, Range 30 as a bearing of North 01 degrees 54 minutes 28 seconds East.

> Tract II: All that part of the West Half of the East Half of the Southwest Quarter of Section 36, Township 44, Range 30, described as follows: Commencing at a point on the Northwest corner of Lot 12, Block 11, of the original Town of Garden City, Missouri; thence North 43 degrees 22 minutes 13 seconds East

(Deed=North 41 degrees 27 minutes East) along the Easterly right-of-way line of 5th Street a distance of 260.19 feet to the intersection of the Easterly right-of-way line of 5th street and the Southerly right-of-way line of Old Highway 7; thence South 46 degrees 39 minutes 07 seconds East along the Southerly right-of-way of Old Highway 7 a distance of 227.90 feet to the point of beginning; thence continuing South 46 degrees 39 minutes 07 seconds East along the Southerly right-of-way of Old Highway 7 a distance of 124.39 feet to the intersection of the Southerly right-of-way of Old Highway 7 and the Westerly right-of-way line of Park Street; thence South 01 degrees 54 minutes 28 seconds West along the Westerly right-of-way line of Park Street a distance of 155.89 feet; thence South 88 degrees 43 minutes 14 seconds West a distance of 118.62 feet to a point on the Northerly right-of-way line of ″D″ Street; thence North 46 Degrees 39 minutes 07 seconds West along said Northerly right-of-way line of ″D″ Street a distance of 82.88 feet; thence North 43 degrees 20 minutes 41 seconds East a distance of 100.00 feet; thence North 46 degrees 39 minutes 07 seconds West a distance of 60.25 feet; thence North 43 degrees 20 minutes 41 seconds East a distance of 100.19 feet to the point of beginning.

Tract III:

A part of the West Half of the East Half of the Southwest Quarter of Section 36, Township 44, Range 30, in the City of Garden City, Cass County, Missouri, described as follows: Beginning at the intersection of the Southwesterly line of ″C″ Street and the Southeasterly line of Fifth Street, in the Town of Garden City; running thence South 41 degrees 27 minutes West along the Southeasterly line of Fifth Street 90 feet; thence South 48 degrees 33 minutes East parallel to the Southwesterly line of said ″C″ Street 180 feet; thence Northeasterly parallel to said Fifth Street 90 feet to the Southwesterly line of said ″C″ Street thence Northwesterly along the Southwesterly line of said ″C″ Street, 180 feet to the Place of Beginning.

Commonly known as 505 Old 7 Highway, Garden City, Missouri (hereinafter referred to as "Cass County Real Property").  A copy of the Cass County Deed of Trust is submitted herewith as **Exhibit 6** and incorporated herein by this reference.

27.     The Cass County Deed of Trust was duly filed and recorded on May 10, 2018, in the Office of the Recorder of Deeds, Cass County, Missouri, in Book 4246 at Page 2. *See* **Exhibit 6**.

28.     On March 30, 2018, B&B Capital executed, acknowledged, and delivered to the Lender, an Assignment of Rents (the "Cass County AoR") relating to the Lawson Real Property.

A copy of the Cass County AoR is submitted herewith as **Exhibit 7** and incorporated herein by this reference.

29.     The Cass County AoR was duly filed and recorded on May 10, 2018, in the Office of the Recorder of Deeds, Cass County, Missouri, in 4246 at Page 3. *See* **Exhibit 7**.

30.     On May 11, 2018, B&B Capital executed, acknowledged, and delivered to the Lender a Modification of Deed of Trust relating to the Cass County Deed of Trust (the "Cass County Modification of Deed of Trust"). A copy of the Cass County Modification of Deed of Trust is submitted herewith as **Exhibit 8** and incorporated herein by this reference.

31.     The Cass County Modification of Deed of Trust was duly filed and recorded on June 7, 2018, in the Office of the Recorder of Deeds, Cass County, Missouri, in Book 4255 at Page 130. *See* **Exhibit 8**.

32.     On March 30, 2018, Borrowers executed, acknowledged, and delivered to Lender a Commercial Security Agreement (the "511407939 Security Agreement").    A copy of the 511407939 Security Agreement is submitted herewith as **Exhibit 9** and incorporated herein by this reference.

33.     Pursuant to the terms of the 511407939 Security Agreement, Borrowers granted a security interest in certain personal property, "whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located," and described as:

    All Equipment
    2000 MACK A-20-SDR4 (VIN 1M2AA12C7YW129291)
    2001 CHEVROLET 3500 DURAMAX (VIN 1GBJK34102E286431)
    1995 LORAL 3000E (VIN 1HTGBADR8VH454242I
    2006 FORD F-550 (VIN 1FDAF57PX6EB09575I
    2001 FORD F-350 (VIN 1FDWF37F31EB98528)
    1986 KENWORTH T600 (VIN 1XKADB9X7GS333805)
    1999 FREIGHTLINER (VIN 1FUYDSEB4XDB06186)
    1988 PETER BILT (VIN 1XPCDB9X5JD253790)

…

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

(hereinafter the "511407939 Collateral."). *See* **Exhibit 9**.

34.     Pursuant to the terms of the 511407939 Security Agreement, the 511407939

Collateral secures the amounts due under the 511407939 Note, as well as:

[A]ll obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

*See* **Exhibit 9**.

35.     Lender perfected its interest security interest in the vehicles described as 2000

MACK A-20-SDR4 (VIN 1M2AA12C7YW129291), 2002 CHEVROLET 3500 DURAMAX

(VIN 1GBJK34102E286431), 2006 FORD F-550 (VIN 1FDAF57PX6EB09575, 2001 FORD F-

350 (VIN 1FDWF37F31EB98528), 1986 KENWORTH T600 (VIN 1XKADB9X7GS333805), 1999 FREIGHTLINER (VIN 1FUYDSEB4XDB06186), 1988 PETER BILT (VIN 1XPCDB9X5JD253790) by recording its lien against the titles of the same (the "511407939 Vehicle Titles"). Copies of the 511407939 Vehicle Titles are submitted herewith as collective **Exhibit 10** and incorporated herein by this reference.

36.     On February 12, 2018, Lender perfected its interest security interest in the remaining 511407939 Collateral by filing a UCC-1 Financing Statement (Filing no. 1802129992157) with the Missouri Secretary of State (the "Financing Statement"). A copy of the c, plus an amendment (Filing No. 1808151871202) and a Continuation Statement (Filing No. 20221212003262297) are submitted herewith as collective **Exhibit 11** and incorporated herein by this reference.

37.     On May 9, 2018, Borrowers executed a Promissory Note (the "Second 511407939 Note") payable to Lender in the principal amount of $1,250,000.  A copy of the Second Amended 511407939 Note is submitted herewith as **Exhibit 12** and incorporated herein by this reference.

38.     On May 9, 2019, Borrowers executed a Change in Terms Agreement (the "First 511407939 CTA") relating to the Second Amended 511407939 Note. A copy of the First 511407939 CTA is submitted herewith as **Exhibit 13** and incorporated herein by this reference.

39.     On July 19, 2019, Borrowers executed a Promissory Note (the "Third Amended 511407939 Note") payable to Lender in the principal amount of $1,600,000.  A copy of the Third Amended 511407939 Note is submitted herewith as **Exhibit 14** and incorporated herein by this reference.

40.     On January 31, 2020, Borrowers executed a Promissory Note (the "Fourth Amended 511407939 Note") payable to Lender in the principal amount of $2,000,000.  A copy of the Fourth Amended 511407939 Note is submitted herewith as **Exhibit 15** and incorporated herein by this reference.

41.     On August 5, 2020, Borrowers executed a Change in Terms Agreement (the "Second 511407939 CTA") relating to the Fourth Amended 511407939 Note. A copy of the Second 511407939 CTA is submitted herewith as **Exhibit 16** and incorporated herein by this reference.

42.     On November 5, 2020, Borrowers executed a Change in Terms Agreement (the "Third 511407939 CTA") relating to the Fourth Amended 511407939 Note. A copy of the Third 511407939 CTA is submitted herewith as **Exhibit 17** and incorporated herein by this reference.

43.     On February 5, 2021, Borrowers executed a Change in Terms Agreement (the "Fourth 511407939 CTA") relating to the Fourth Amended 511407939 Note. A copy of the Fourth 511407939 CTA is submitted herewith as **Exhibit 18** and incorporated herein by this reference.

44.     On May 5, 2021, Borrowers executed a Change in Terms Agreement (the "Fifth 511407939 CTA") relating to the Fourth Amended 511407939 Note. A copy of the Fifth 511407939 CTA is submitted herewith as **Exhibit 19** and incorporated herein by this reference.

45.     Additionally, on May 5, 2021, the Borrowers executed a Business Loan Agreement (the "Loan Agreement"). A copy of the Loan Agreement is submitted herewith as **Exhibit 20** and incorporated herein by this reference.

46.     The Loan Agreement states the following:

**Attorneys' Fees; Expenses.** Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such

10

enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Loan, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 20**.

47.     On September 10, 2021, Borrowers executed a Change in Terms Agreement (the "Sixth 511407939 CTA") relating to the Fourth Amended 511407939 Note. A copy of the Sixth 511407939 CTA is submitted herewith as **Exhibit 21** and incorporated herein by this reference.

**B.  *Loan #511407936***

48.     On February 9, 2018, B&B Capital executed a Promissory Note (the "511407936 Note") payable to Lender in the principal amount of $1,111,000.  A copy of the 511407936 Note is submitted herewith as **Exhibit 22** and incorporated herein by this reference.

49.     The maturity date of the 511407936 Note was February 9, 2028. *See* **Exhibit 22**.

50.     On March 30, 2018, B&B Capital executed, acknowledged, and delivered to Lender a Commercial Security Agreement (the "511407936 Security Agreement").    A copy of the 511407936 Security Agreement is submitted herewith as **Exhibit 23** and incorporated herein by this reference.

51.     Pursuant to the terms of the 511407936 Security Agreement, B&B Capital granted a security interest in certain personal property, "whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located," and described as:

All Inventory, Accounts and Equipment
2009 STERLING (VIN 2FZHCHBS49AAD0130)
1991 FORD CHASSIS (VIN 1FDXK84A9MVA04658)
2006 FREIGHTLINER (VIN 1 FVHCYDC86HW89524)
1988 INTERNATIONAL (VIN 1HTLH0009JH582238)
1999 FORD (VIN 1FTWX33F1XEE67853)

…

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

(hereinafter the "511407936 Collateral."). *See* **Exhibit 23**.

52.     Pursuant to the terms of the 511407936 Security Agreement, the 511407936

Collateral secures the amounts due under the 511407936 Note, as well as:

[A]ll obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

*See* **Exhibit 23**.

53.     Lender perfected its interest security interest in the vehicles described as 1991

FORD CHASSIS (VIN 1FDXK84A9MVA04658), 2006 FREIGHTLINER (VIN 1

FVHCYDC86HW89524), 1988 INTERNATIONAL (VIN 1HTLH0009JH582238), 1999 FORD

(VIN 1FTWX33F1XEE67853) by recording its lien against the titles of the same (the "511407936

Vehicle Titles"). Copies of the 511407936 Vehicle Titles are submitted herewith as collective **Exhibit 24** and incorporated herein by this reference.

54.    On February 12, 2018, Lender perfected its interest security interest in the remaining 511407936 Collateral by the filing of the Financing Statement with the Missouri Secretary of State. *See* **Exhibit 11**.

55.    On May 21, 2020, B&B Capital executed a Change in Terms Agreement (the "First 511407936 CTA") relating to the 511407936 Note. A copy of the First 511407936 CTA is submitted herewith as **Exhibit 25** and incorporated herein by this reference.

56.    On May 4, 2021, B&B Capital executed a Change in Terms Agreement (the "Second 511407936 CTA") relating to the 511407936 Note. A copy of the Second 511407936 CTA is submitted herewith as **Exhibit 26** and incorporated herein by this reference.

57.    On June 29, 2021, B&B Capital executed a Change in Terms Agreement (the "Third 511407936 CTA") relating to the 511407936 Note. A copy of the Third 511407936 CTA is submitted herewith as **Exhibit 27** and incorporated herein by this reference.

### C. *Loan #511411205*

58.    On April 10, 2018, Borrowers executed a Promissory Note (the "511411205 Note") payable to Lender in the principal amount of $1,024,000.  A copy of the 511411205 Note is submitted herewith as **Exhibit 28** and incorporated herein by this reference.

59.    On May 21, 2020, Borrowers executed a Change in Terms Agreement (the "First 511411205 CTA") relating to the 511411205 Note. A copy of the First 511411205 CTA is submitted herewith as **Exhibit 29** and incorporated herein by this reference.

60.     On May 4, 2021, Borrowers executed a Change in Terms Agreement (the "Second 511411205 CTA") relating to the 511411205 Note. A copy of the Second 511411205 CTA is submitted herewith as **Exhibit 30** and incorporated herein by this reference.

61.     On June 29, 2021, Borrowers executed a Change in Terms Agreement (the "Third 511411205 CTA") relating to the 511411205 Note. A copy of the Third 511411205 CTA is submitted herewith as **Exhibit 31** and incorporated herein by this reference.

### D. *Loan #511411208*

62.     On April 10, 2018, Borrowers executed a Promissory Note (the "511411208 Note") payable to Lender in the principal amount of $533,000. A copy of the 511411208 Note is submitted herewith as **Exhibit 32** and incorporated herein by this reference.

63.     On May 21, 2020, Borrowers executed a Change in Terms Agreement (the "First 511411208 CTA") relating to the 511411208 Note. A copy of the First 511411208 CTA is submitted herewith as **Exhibit 33** and incorporated herein by this reference.

64.     On May 4, 2021, Borrowers executed a Change in Terms Agreement (the "Second 511411208 CTA") relating to the 511411208 Note. A copy of the Second 511411208 CTA is submitted herewith as **Exhibit 34** and incorporated herein by this reference.

65.     On June 29, 2021, Borrowers executed a Change in Terms Agreement (the "Third 511411208 CTA") relating to the 511411208 Note. A copy of the Third 511411208 CTA is submitted herewith as **Exhibit 35** and incorporated herein by this reference.

### E. *Credit Card*

66.     On February 28, 2018, B&B Capital completed a Credit Card Application, seeking a line of credit from Lender and the issuance of business credit cards. A copy of the Application is included herewith as **Exhibit 36** and incorporated herein by this reference.

67.     Pursuant to the Application, B&B Capital agreed to be bound by the terms and conditions set forth in the Application. *See* **Exhibit 36**.

68.     In connection with the Application, B&B Capital executed a Collateral Agreement, pursuant to which B&B Capital agreed that the credit extended by the business credit cards would be secured by the security agreements it executed in favor of Lender. A copy of the Collateral Agreement is included herewith as **Exhibit 37** and incorporated herein by this reference.

69.     Lender extended credit to B&B Capital though the issuance of the requested business cards.

**F. *Guaranties***

70.     Briegel executed a Commercial Guaranty dated February 9, 2018 (the "Briegel Guaranty").  A copy of the Briegel Guaranty is included herewith as **Exhibit 38** and incorporated herein by this reference.

71.     Pursuant to the terms of the Briegel Guaranty, Briegel:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [B&B Capital] to Lender, and the performance and discharge of all [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [Briegel] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. [Briegel] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [Briegel's] liability is unlimited and [Briegel's] obligations are continuing.

*See* **Exhibit 38**.

72.    The Briegel Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [Briegel] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 38**.

73.    Additionally, Briegel executed an Unconditional Guaranty on February 9, 2018 (the "USDA Briegel Guaranty"). A copy of the USDA Briegel Guaranty is included herewith as **Exhibit 39** and incorporated herein by this reference.

74.    Pursuant to the terms of the USDA Briegel Guaranty, Briegel "unconditionally guarantees payment to Lender of 100% of all amounts owing under the Note including any costs, due under the [511407936 Note] when Lender makes written demand upon [Briegel]." *See* **Exhibit 39**.

75.    Yoder executed a Commercial Guaranty dated February 9, 2018 (the "Yoder Guaranty"). A copy of the Yoder Guaranty is included herewith as **Exhibit 40** and incorporated herein by this reference.

76.    Pursuant to the terms of the Yoder Guaranty, Yoder:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [B&B Capital] to Lender, and the performance and discharge of all [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [Yoder] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any

collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. [Yoder] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [Yoder's] liability is unlimited and [Yoder's] obligations are continuing.

*See* **Exhibit 40**.

77.     The Yoder Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [Yoder] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 40**.

78.     Additionally, Yoder executed an Unconditional Guaranty on February 9, 2018 (the "USDA Yoder Guaranty"). A copy of the USDA Yoder Guaranty is included herewith as **Exhibit 41** and incorporated herein by this reference.

79.     Pursuant to the terms of the USDA Yoder Guaranty, Yoder "unconditionally guarantees payment to Lender of 100% of all amounts owing under the Note including any costs, due under the [511407936 Note] when Lender makes written demand upon [Yoder]." *See* **Exhibit 41**.

80.     Rose Hill executed a Commercial Guaranty dated February 9, 2018 (the "First Rose Hill Guaranty"). A copy of the First Rose Hill Guaranty is included herewith as **Exhibit 42** and incorporated herein by this reference.

81.     Pursuant to the terms of the First Rose Hill Guaranty, Rose Hill:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [B&B Capital] to Lender, and the performance and discharge of all [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [Rose Hill] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. [Rose Hill] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [B&B Capital's] obligations under the [all of B&B Capital's promissory notes and/or credit agreements evidencing [B&B Capital's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [Rose Hill's] liability is unlimited and [Rose Hill's] obligations are continuing.

*See* **Exhibit 42**.

82.    The First Rose Hill Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [Rose Hill] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 42**.

83.    Rose Hill executed a Commercial Guaranty dated March 30, 2018 (the "Second Rose Hill Guaranty"). A copy of the Second Rose Hill Guaranty is included herewith as **Exhibit 43** and incorporated herein by this reference.

84.    Pursuant to the terms of the Second Rose Hill Guaranty, Rose Hill:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [B&B, Briegel, and Yoder] to Lender, and the performance and discharge of all [B&B, Briegel, and Yoder's] obligations under the [all of B&B, Briegel, and Yoder's promissory notes and/or credit agreements

evidencing [B&B, Briegel, and Yoder's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [Rose Hill] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. [Rose Hill] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [B&B, Briegel, and Yoder's] obligations under the [all of B&B's promissory notes and/or credit agreements evidencing [B&B, Briegel, and Yoder's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [Rose Hill's] liability is unlimited and [Rose Hill's] obligations are continuing.

*See* **Exhibit 43**.

85.     The Second Rose Hill Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [Rose Hill] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 43**.

86.     Rose Hill executed a Commercial Guaranty dated May 5, 2021 (the "Third Rose Hill Guaranty"). A copy of the Third Rose Hill Guaranty is included herewith as **Exhibit 44** and incorporated herein by this reference.

87.     Pursuant to the terms of the Third Rose Hill Guaranty, Rose Hill:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [B&B, Briegel, and Yoder] to Lender, and the performance and discharge of all [B&B, Briegel, and Yoder's] obligations under the [all of B&B, Briegel, and Yoder's promissory notes and/or credit agreements evidencing [B&B, Briegel, and Yoder's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and

the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [Rose Hill] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. [Rose Hill] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [B&B, Briegel, and Yoder's] obligations under the [all of B&B's promissory notes and/or credit agreements evidencing [B&B, Briegel, and Yoder's] loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [Rose Hill's] liability is unlimited and [Rose Hill's] obligations are continuing.

*See* **Exhibit 44**.

88.    The Third Rose Hill Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [Rose Hill] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 44**.

89.    B&B Legacy executed a Commercial Guaranty dated February 5, 2021 (the "B&B Legacy Guaranty").  A copy of the B&B Legacy Guaranty is included herewith as **Exhibit 45** and incorporated herein by this reference.

90.    Pursuant to the terms of the B&B Legacy Guaranty, B&B Legacy:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of [Borrowers] to Lender, and the performance and discharge of all [Borrowers'] obligations under the [all of Borrowers' promissory notes and/or credit agreements evidencing Borrowers' loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against [B&B Legacy] even when Lender has not exhausted Lender's remedies against anyone· else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this

Guaranty or any other guaranty of the Indebtedness. [B&B Legacy] will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform [Borrowers'] obligations under the [all of Borrowers' promissory notes and/or credit agreements evidencing Borrowers' loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements] and Related Documents. Under this Guaranty, [B&B Legacy's] liability is unlimited and [B&B Legacy's] obligations are continuing.

*See* **Exhibit 45**.

91.    The B&B Legacy Guaranty states that:

Lender may hire or pay someone else to help enforce this Guaranty, and [B&B Legacy] shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Indebtedness, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

*See* **Exhibit 45**.

## G. *Life insurance assignments.*

92.    On or about May 4, 2021, to secure all indebtedness owed by Borrowers to Lender, B&B pledged, assigned, and delivered his interest in that certain State Farm life insurance policy number LF-4022-8867 with a benefit amount of $800,000.00 covering the life of Briegel. A copy of the Briegel Life Insurance Assignment is submitted herewith as **Exhibit 46** and incorporated herein by this reference.

93.    On or about May 4, 2021, to secure all indebtedness owed by Borrowers to Lender, B&B pledged, assigned, and delivered his interest in that certain State Farm life insurance policy number LF-4023-2963 with a benefit amount of $500,000.00 covering the life of Yoder. A copy of the Yoder Life Insurance Assignment is submitted herewith as **Exhibit 47** and incorporated herein by this reference.

## H. *Default and Forbearance*

94.     The 511407939 Note (as amended by the First Amended 511407939 Note, Second Amended 511407939 Note, First 511407939 CTA, Second 511407939 CTA, Third 511407939 CTA, Fourth 511407939 CTA, Fifth 511407939 CTA, Sixth 511407939 CTA) matured on May 10, 2022.

95.     Borrowers did not pay the amount due upon maturity under the 511407939 Note and defaulted on the 511407939 Note.

96.     Borrowers' default under the terms of the 511407939 Note constituted a default under the 511407939 Security Agreement, the Cass County Deed of Trust, the Cass County AoR, the Cass County Modification of Deed of Trust, the Ray County Deed of Trust, the Ray County Modification of Deed of Trust, the Ray County AoR, the 511407936 Note, the 511407936 Security Agreement, the 511411208 Note (as amended by the First 511411208 CTA, Second 511411208 CTA, and Third 511411208 CTA), the Briegel Guaranty, the USDA Briegel Guaranty, the Yoder Guaranty, the USDA Yoder Guaranty, the First Rose Hill Guaranty, the Second Rose Hill Guaranty, the Third Rose Hill Guaranty, the B&B Legacy Guaranty, the Loan Agreement, the Briegel Life Insurance Assignment, and the Yoder Life Insurance Assignment (hereinafter collectively the "Loan Documents").

97.     On June 29, 2022, Borrowers, B&B Legacy, and Rose Hill entered into as Forbearance Agreement with Lender. A copy of the Forbearance Agreement is submitted herewith as **Exhibit 48** and incorporated herein by this reference.

98.     Pursuant to the terms of the Forbearance Agreement, Lender agreed to forbear from exercising its rights under the Loan Documents,[1] and the maturity date for the 511407939 Note was extended to October 1, 2022. *See* **Exhibit 48**.

---

[1] The USDA Briegel Guaranty and the USDA Yoder Guaranty were not referenced in the Forbearance Agreement.

99.     On October 1, 2022, Borrowers, B&B Legacy, and Rose Hill entered into an Amended and Restated Forbearance Agreement with Lender ("First Amended Forbearance Agreement"). A copy of the First Amended Forbearance Agreement is submitted herewith as **Exhibit 49** and incorporated herein by this reference.

100.     Pursuant to the terms of the First Amended Forbearance Agreement, Lender agreed to forbear from exercising its rights under the Loan Documents, and the maturity date for the 511407939 Note was extended to February 1, 2023. *See* **Exhibit 49**.

101.     On February 1, 2023, Borrowers, B&B Legacy, and Rose Hill entered into an Amended and Restated Forbearance Agreement with Lender ("Second Amended Forbearance Agreement"). A copy of the Second Amended Forbearance Agreement is submitted herewith as **Exhibit 50** and incorporated herein by this reference.

102.     Pursuant to the terms of the Second Amended Forbearance Agreement, Lender agreed to forbear from exercising its rights under the Loan Documents, and the maturity date for the 511407939 Note was extended to May 1, 2023. *See* **Exhibit 50**.

103.     On May 1, 2023, Borrowers, B&B Legacy, and Rose Hill entered into an Amended and Restated Forbearance Agreement with Lender ("Third Amended Forbearance Agreement"). A copy of the Third Amended Forbearance Agreement is submitted herewith as **Exhibit 51** and incorporated herein by this reference.

104.     Pursuant to the terms of the Third Amended Forbearance Agreement, Lender agreed to forbear from exercising its rights under the Loan Documents, and the maturity date for the 511407939 Note was extended to August 1, 2023. *See* **Exhibit 51**.

105.     Pursuant to the terms of the Third Amended Forbearance Agreement, Borrowers, B&B Legacy, and Rose Hill agreed that:

they have executed their respective Loan Documents as indicated in the Recitals above, and that the Loan Documents represent valid and binding obligations upon them respectively. Borrower and Guarantors agree that Borrower has defaulted on [511407939 Note] which is a default on all Loan Documents, that Guarantors are obligated to pay the debt due on the Notes under the terms of the Guaranties, and that the amount due on each Note is accurately stated in the Recitals to this Agreement. Borrower and Guarantors each agree that Lender is now entitled to enforce the Loan Documents, and that they have no valid defenses to any legal action brought to enforce the Loan Documents. Borrower and Guarantors understand and agree that nothing herein constitutes a waiver by Lender of enforcing the Loan Documents upon a default by Borrower of this Agreement. In the event of such default and Lender's election to enforce the Loan Documents, Borrower and Guarantors shall be deemed to have waived any defense to Lender's enforcement of the Loan Documents.

*See* **Exhibit 51**.

106.     The 511407939 Note matured on August 1, 2023.

107.     Borrowers did not pay the amount due upon maturity under the 511407939 Note.

108.     B&B Legacy, and Rose Hill did not pay the amount due upon maturity under the 511407939 Note.

109.     As of September 7, 2023. The following amounts were due under the Loan Documents:

**511407939 Note**. Principal balance of $1,487,265.06 plus accrued interest of $40,176.82, with additional interest to accrue from and after September 7, 2023 at the rate of 9.5% per annum, or $392.472724 per day, until paid in full, and late charges of $750.00;

**511407936 Note**. Principal balance of $691,614.12 plus accrued interest of $14,264.54, with additional interest to accrue from and after September 7, 2023 at the rate of 8.25% per annum, or $158.494902 per day, until paid in full, and late charges of $1,182.12;

**511411205 Note**. Principal balance of $895,587.79 plus accrued interest of $13,904.50, with additional interest to accrue from and after September 7, 2023 at the rate of 6.28% per annum, or $156.230314 per day, until paid in full, and late charges of $688.64;

**511411208 Note**. Principal balance of $338,719.53 plus accrued interest of $5,258.81, with additional interest to accrue from and after September 7, 2023 at the rate of 5.15% per annum, or $59.087740 per day, until paid in full, and late charges of $571.06; and

110.     Defendants remain in default under the Loan Documents.

111.    Lender has incurred attorneys' fees and costs of collection in enforcing its rights under the Loan Documents in the amount of $46,626.10 and is entitled to recover those attorneys' fees and costs of collection.

112.    Lender will continue to incur attorneys' fees and costs of collection in enforcing its rights under the Loan Documents and is entitled to recover those attorneys' fees and costs of collection.

## COUNT I
### Breach of Note against B&B Capital, Briegel, and Yoder (Loan No. 511407939)

113.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

114.    Borrowers executed the 511407939 Note in favor of Plaintiff.

115.    Plaintiff fully performed its obligations under the 511407939 Note.

116.    Borrowers are in default under the 511407939 Note for among other things, failure to make payments when due.

117.    The indebtedness owed under the 511407939 Note has been fully accelerated and the 10.00% default rate of interest instituted as of September 7, 2023.

118.    The amount due and owing under the 511407939 Note as of September 7, 2023 is $1,528,191.88, including $1,487,265.06 in principal, $40,176.82 in accrued interest, a $750.00 late charge together with all charges, attorney's fees and costs of collection. Interest continues to accrue on the balance at the rate of 9.5% per annum, or $392.472724 per day, until paid in full.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B Capital, Briegel, and Yoder, jointly and severally, in an amount of $1,528,191.88, including $1,487,265.06 in principal, $40,176.82 in accrued interest, a $750.00 late charge together with accruing interest at a rate of 9.5% per annum, or $392.472724 per day after September 7, 2023,

plus all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT II
### *Breach of Note against B&B Capital (Loan No. 511407936)*

119. Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

120. B&B Capital executed the 511407936 Note in favor of Plaintiff.

121. Lender fully performed its obligations under the 511407936 Note.

122. B&B Capital is in default under the 511407936 Note for among other things, failure to make payments when due.

123. The indebtedness owed under the 511407936 Note has been fully accelerated and the 15.00% default rate of interest instituted as of September 7, 2023.

124. The amount due and owing under the 511407936 Note as of September 7, 2023 is $707,060.78, including $691,614.12 in principal, $14,264.54 in accrued interest, a $1,182.12 late charge together with all charges, attorney's fees and costs of collection. Interest continues to accrue on the balance at the rate of 8.25% per annum, or $158.494902 per day, until paid in full.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B $707,060.78, including $691,614.12 in principle, $14,264.54 in accrued interest, a $1,182.12 late charge together with accruing interest at the rate of 8.25% per annum, or $158.494902 per day after September 7, 2023, plus all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT III
### *Breach of Note against B&B Capital, Briegel, and Yoder (Loan No. 511411205)*

125.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

126.    Borrowers executed the 511411205 Note in favor of Plaintiff.

127.    Plaintiff fully performed its obligations under the 511411205 Note.

128.    Borrowers are in default under the 511411205 Note for among other things, failure to make payments when due.

129.    The indebtedness owed under the 511411205 Note has been fully accelerated and the 10.00% default rate of interest instituted as of September 7, 2023.

130.    The amount due and owing under the 511411205 Note as of September 7, 2023 is $910,180.93, including $895,587.79 in principal, $13,904.50 in accrued interest, a $688.64 late charge together with all charges, attorney's fees and costs of collection. Interest continues to accrue on the balance at the rate of 6.28% per annum, or $156.230314 per day, until paid in full.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B Capital, Briegel, and Yoder, jointly and severally, in an amount of $910,180.93, including $895,587.79 in principal, $13,904.50 in accrued interest, a $$688.64 late charge together with accruing interest at the rate of 86.28% per annum, or $156.230314 per day after September 7, 2023, plus all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.


## COUNT IV
### Breach of Note against B&B Capital, Briegel, and Yoder (Loan No. 511411208)

131.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

132.    Borrowers executed the 511411208 Note in favor of Plaintiff.

133. Plaintiff fully performed its obligations under the 511411208 Note.

134. Borrowers are in default under the 511411208 Note for among other things, failure to make payments when due.

135. The indebtedness owed under the 511411208 Note has been fully accelerated and the 10.00% default rate of interest instituted as of September 7, 2023.

136. The amount due and owing under the 511411208 Note as of September 7, 2023 is $344,549.40, including $338,719.53 in principal, $5,258.81 in accrued interest, a $571.06 late charge together with all charges, attorney's fees and costs of collection.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B Capital, Briegel, and Yoder, jointly and severally, in an amount of $338,719.53 in principal, $5,258.81 in accrued interest, a $571.06 late charge together with accruing interest at the rate of 5.15% per annum, or $59.087740 per day after September 7, 2023, plus all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT V
### *Breach of Guaranty against Briegel*

137. Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

138. Briegel executed the Briegel Guaranty in favor of Lender.

139. The Briegel Guaranty executed by Briegel is absolute, direct and unconditional. More specifically, the Briegel Guaranty provides that Briegel will pay on demand the full amount of all sums owed by B&B Capital to Lender, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

140. B&B Capital in default of its obligations under the Loan Documents.

141.    The amount due and owing to Lender by Briegel on the Briegel Guaranty as of September 7, 2023 is $3,577,741.37 with interest continuing to accrue as provided by the Loan Documents.

142.    Additionally, pursuant to the terms of the Briegel Guaranty, Briegel is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Lender respectfully requests that the Court enter judgment against Briegel in an amount of $3,577,741.37 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT VI
### *Breach of Guaranty against Briegel*

143.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

144.    Briegel executed the USDA Briegel Guaranty in favor of Lender.

145.    The USDA Briegel Guaranty executed by USDA Briegel is absolute, direct and unconditional.  More specifically, the USDA Briegel Guaranty provides that Briegel will pay on demand the full amount of all sums owed by B&B Capital to Lender pursuant to the 511407936 Note, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

146.    B&B Capital in default of its obligations under the Loan Documents.

147.    The amount due and owing to Lender by Briegel on the USDA Briegel Guaranty as of September 7, 2023 is $707,060.78 with interest continuing to accrue as provided by the Loan Documents.

148.    Additionally, pursuant to the terms of the USDA Briegel Guaranty, Briegel is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Lender respectfully requests that the Court enter judgment against Briegel in an amount of $707,060.78 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT VII
### *Breach of Guaranty against Yoder*

149. Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

150. Yoder executed the Yoder Guaranty in favor of Lender.

151. The Yoder Guaranty executed by Yoder is absolute, direct and unconditional. More specifically, the Yoder Guaranty provides that Yoder will pay on demand the full amount of all sums owed by B&B Capital to Lender, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

152. B&B Capital in default of its obligations under the Loan Documents.

153. The amount due and owing to Lender by Yoder on the Yoder Guaranty as of September 7, 2023 is $3,577,741.37 with interest continuing to accrue as provided by the Loan Documents.

154. Additionally, pursuant to the terms of the Yoder Guaranty, Yoder is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Lender respectfully requests that the Court enter judgment against Yoder in an amount of $3,577,741.37 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT VIII

***Breach of Guaranty against Yoder***

155.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

156.    Yoder executed the USDA Yoder Guaranty in favor of Lender.

157.    The USDA Yoder Guaranty executed by USDA Yoder is absolute, direct and unconditional. More specifically, the USDA Yoder Guaranty provides that Yoder will pay on demand the full amount of all sums owed by B&B Capital to Lender pursuant to the 511407936 Note, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

158.    B&B Capital in default of its obligations under the Loan Documents.

159.    The amount due and owing to Lender by Yoder on the USDA Yoder Guaranty as of September 7, 2023 is $707,060.78 with interest continuing to accrue as provided by the Loan Documents.

160.    Additionally, pursuant to the terms of the USDA Yoder Guaranty, Yoder is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Lender respectfully requests that the Court enter judgment against Yoder in an amount of $707,060.78 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

<u>COUNT IX</u>
***Breach of Guaranty against Rose Hill***

161.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

162.    Rose Hill executed the First Rose Hill Guaranty, the Second Rose Hill Guaranty, and the Third Rose Hill Guaranty (collectively the "Rose Hill Guaranties") in favor of Lender.

163. The Rose Hill Guaranties executed by Rose Hill are absolute, direct and unconditional. More specifically, the Rose Hill Guaranties provide that Rose Hill will pay on demand the full amount of all sums owed by Borrowers to Lender, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

164. Borrowers are in default of its obligations under the Loan Documents.

165. The amount due and owing to Lender by Rose Hill on the Rose Hill Guaranties as of September 7, 2023 is $3,577,741.37 with interest continuing to accrue as provided by the Loan Documents.

166. Additionally, pursuant to the terms of the Rose Hill Guaranties, Rose Hill is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Rose Hill in an amount of $3,577,741.37 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT X
### *Breach of Guaranty against B&B Legacy*

167. Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

168. B&B Legacy executed the B&B Legacy Guaranty in favor of Lender.

169. The B&B Legacy Guaranty executed by B&B Legacy is absolute, direct and unconditional. More specifically, the B&B Legacy Guaranty provides that B&B Legacy will pay

on demand the full amount of all sums owed by Borrowers to Lender, together with all costs and expenses including, without limitation, reasonable attorneys' fees.

170. Borrowers are default of its obligations under the Loan Documents.

171. The amount due and owing to Lender by B&B Legacy on the B&B Legacy Guaranty as of September 7, 2023 is $3,577,741.37 with interest continuing to accrue as provided by the Loan Documents.

172. Additionally, pursuant to the terms of the B&B Legacy Guaranty, B&B Legacy is liable for all of Lender's attorney's fees and costs incurred in collecting the indebtedness owed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B Legacy in an amount of $3,577,741.37 with interest continuing to accrue, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

## COUNT XI
### *Action on Account against B&B Capital*

173. Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

174. B&B Capital executed the Application in favor of Lender and agreed to the terms set forth therein.

175. Lender fully performed its obligations by issuing business credit cards and extending credit to B&B Capital.

176. B&B Capital is in default by failing to make payments when due.

177. The amount due and owing under the 511407936 Note as of August 31, 2023 is $40,533.61, together with all charges, attorney's fees and costs of collection.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against B&B Capital in an amount of $40,533.61, together with all charges, attorney's fees and costs of collection; post-judgment interest; and such further and other relief as the Court deems appropriate.

**COUNT XII**
***Replevin of Personal Property against B&B Capital, Briegel, and Yoder***

178.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

179.    Pursuant to the terms of the 511407939 Security Agreement and the 511407936 Security Agreement (hereinafter collectively the "Security Agreements"), Borrowers granted a security interest to Plaintiff in the 511407939 Collateral and the 511407936 Collateral (hereinafter collectively the "Collateral") to secure the amounts due under the 511407939 Note and the 511407936 Note. *See* **Exhibits 9, 23**.

180.    Borrowers are in default of their obligations under the Loan Documents for, among other things, failure to make payments pursuant to the Forbearance Agreement, as amended, which modified the obligations under the 511407939 Note, the 511407936 Note, the 511411205 Note, and the 511411208 Note (hereinafter collectively the "Notes").

181.    Under the terms of the Security Agreements, a payment default under the 511407939 Note and the 511407936 Note is an event of default. *See* **Exhibits 9, 23**.

182.    Under the terms of the Security Agreements, upon an event of default, Lender may exercise its rights under applicable state and federal law. *See* **Exhibits 9, 23**.

183.    Lender is entitled to immediate possession of the Collateral. *See* Mo. Rev. Stat. § 400.9-609 (A secured party, after default, may take possession of the collateral using judicial process); Mo. R. Civ. P. 99.04.

184.    Lender's perfected security interest in the Collateral is legal, valid and enforceable and constitutes a first priority lien and security interest in the Collateral.

185.    The Collateral is of a nature so that is it easily movable, readily marketable and can be easily hidden, concealed or damaged by misuse.  Consequently, Lender is in danger of losing its Collateral unless it is taken out of the possession of Borrowers or otherwise secured.

186.    The Collateral has not been seized under any legal process.

187.    Pursuant to Rule 99.06, Lender is prepared to file a sufficient delivery bond upon the approval of the Court.

WHEREFORE, Lender respectfully requests that the Court 1) Enter an order directing that Defendants immediately voluntarily surrender and deliver the Collateral to Lender and/or that the U.S. Marshalls for the Western District of Missouri, take possession of the Collateral and deliver it to Lender; 2) Enter judgment for possession of the Collateral pursuant to the terms of the Loan Documents and applicable law, and for such further and other relief that this Court deems appropriate.

## COUNT XIII
### *Foreclosure of Personal Property against B&B Capital, Briegel, and Yoder.*

188.    Lender restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

189.    Pursuant to the terms of the Security Agreements, the Collateral to secure the amounts due under the 511407939 Note and the 511407936 Note. *See* **Exhibits 9, 23**.

190.     Borrowers are in default of their obligations under the Loan Documents for, among other things, failure to make payments pursuant to the Forbearance Agreement, as amended, which modified the obligations under the Notes.

191.     Under the terms of the Security Agreements, a payment default under the 511407939 Note and the 511407936 Note is an event of default. *See* **Exhibits 9, 23**.

192.     Under the terms of the Security Agreements, upon an event of default, Lender may exercise its rights under applicable state and federal law. *See* **Exhibits 9, 23**.

193.     Under Missouri law, after default, a secured party "May reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure." MO. REV. STAT. § 400.9-601.

194.     Plaintiff is entitled that the Collateral be foreclosed upon, that the same be ordered sold according to law for the satisfaction of the money judgment or of any balance remaining unpaid thereon, and forever barring Defendants and each thereof from any right, claim, interest, or title in and to the Collateral that the Court then enter its further decree against Defendants for any deficiency remaining due to Plaintiff herein after the application of the proceeds of the sale of such security.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order that Plaintiff's Article 9 lien against the Collateral be foreclosed upon, that the same be ordered sold according to law for the satisfaction of the money judgment or of any balance remaining unpaid thereon, and forever barring Borrowers and each thereof from any right, claim, interest, or title in and to the Collateral; that the Court then enter its further decree against Borrowers for any deficiency remaining due to Plaintiff herein after the application of the proceeds of the sale of such security, and for such further and other relief that this Court deems appropriate.

## COUNT XIV
### *Appointment of a Receiver (Borrowers)*

195.    Plaintiff restates and incorporates herein by reference the allegations contained in each of the foregoing paragraphs of this Complaint as if set forth in full herein.

196.    Plaintiff has a valid, first priority security interest in the Collateral and valid, first priority mortgage liens in the Cass County Real Property and the Ray County Property.

197.    The Security Agreements both state that:

Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

*See* **Exhibits 9, 23**.

198.    The Cass County Deed of Trust and the Ray County Deed of Trust both state that:

Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

*See* **Exhibits 9, 23**.

199.    Appointment of a receiver is necessary to protect Lender's secured position in the Collateral, the Cass County Real Property and the Ray County Property and their revenue producing potential.

200.    Borrowers are not able to pay their debts when due, as evidenced by their prior failure to pay Lender.

201. Plaintiff requests that the receiver be granted rights to occupy the Cass County Real Property and the Ray County Property and use all of Borrowers' personal property which may affect the rights of all defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order appointing a general receiver for all of the Borrowers' real and personal property (hereinafter collectively referred to as "Receivership Property") and to take immediate possession and control of the Receivership Property including all proceeds generated therefrom, either now existing or hereafter acquired, and administer those assets and give them all the usual, necessary, and incidental powers of receivers for the purposes of preserving, protecting, managing, and maintaining the accounts, and any and all corresponding property rights as he may consider necessary, including the exclusive power and authority to:

    (a) Take possession of other collateral, including all deposit accounts, books and records, data, plans, manuals, computer software, computer tapes, computer systems, computer disks, computer programs, source codes and object codes containing any information necessary to preserve the Receivership Property;

    (b) To take possession of and receive from all depositories, banks, brokerages and otherwise (collectively the "Financial Institutions"), any money on deposit in all such Financial Institutions belonging to or arising from the operation of the Receivership Property, whether such funds be in accounts titled in the name of the Borrowers or not. All Financial Institutions are directed to deliver such deposits to the Receiver and such records as the Receiver may reasonably request with respect to such accounts. The Receiver may indemnify the Financial Institution upon whom such demand is made, and the Receiver is empowered to open or close any such accounts. The Receiver shall deposit monies and funds collected and received in connection with the Receivership Property at a federally insured banking institution or savings association with offices in the State of Missouri;

    (c) To operate and manage the Receivership Property;

    (d) Receive, collect, and preserve all incomes, profits, and other revenues generated from the Receivership Property;

    (e) Operate and manage all other services which are a part of the operation of the Receivership Property;

(f) Preserve and protect, or manage the Receivership Property or enter into agreements with agents who shall manage, maintain and otherwise control the Receivership Property. The Receiver may accept, use and apply advances from Plaintiff to the Receiver for a limited period of time and as may be determined by Plaintiff to preserve and protect the Receivership Property.

(g) Enter into all contracts necessary to continue, maintain, preserve and protect the Receivership Property:

(h) To do all the things which the Borrowers may do in the exercise of ordinary business judgment, or in the ordinary course of the operation and use of the Receivership Property including, without limitation, paying from the revenues of administering the Receivership Property the ordinary and necessary expenses of operating and maintaining the Receivership Property incurred from and after the date of the Receiver's appointment and said other reasonable expenses necessary to maintain the Receivership Property; provided, however, the Receiver may not be permitted to exceed in any given month in the aggregate or with respect to any particular line item the expenses set forth in a budget approved hereafter by Plaintiff and the Receiver, without further order of this Court after notice to the parties and an opportunity for hearing;

(i) To use, sell, or lease Receivership Property other than in the ordinary course of business and as allowed by the provisions of this Order or subsequent orders of this Court, and to execute in the Borrowers' stead such documents, conveyances, and Borrowers' consents as may be required in connection therewith;

(j) To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's duties, including the power to pay obligations incurred prior to the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent in order to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

(k) Make an accounting to keep accurate records concerning the Receivership Property, including the actual income collected and expenses paid each month, and to make such records available to the Court, Plaintiff and other parties to this action;

(l) Permit Plaintiff and its agents and independent contractors to fully inspect the Receivership Property and the Borrowers' books and records;

(m) Appoint agents and employees that are necessary to take charge of, repair, and maintain the Receivership Property;

(n) Make, cancel, enforce, or modify contracts, leases, or licenses relating to any part of the Receivership Property;

39

(o) To assume, reject, or assign executory contracts and unexpired leases pursuant to the provisions of this Order or subsequent orders of this Court;

(p) To compel by subpoena any person to submit to an examination under oath, in the manner of a deposition in accordance with Rule 57.03 of the Missouri Rules of Civil Procedure, with respect to Receivership Property or any other matter that may affect the administration of the Receivership;

(q) To intervene in any action in which a Claim is asserted against the Borrowers and which impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. However, the Court shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

(r) To assert any rights, claims, or choses in action of the Borrowers, if and to the extent that the rights, claims, or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the Borrowers any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Borrowers are a party for the purpose of exercising the powers under this subsection;

(s) To assert rights, claims, or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

(t) To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

(u) Comply with all requirements of all governmental authorities;

(v) Pay taxes, assessments, and utility charges;

(w) Employ such persons as necessary to operate the businesses and to collect from any source all sums which may be due from the customers;

(x) Pay himself a reasonable fee, subject to court approval, for the time expended in carrying out his duties as Receiver;

(y) Employ independent accountants and legal counsel to assist the Receiver in the performance of his duties as may be necessary during the period of the receivership and pay reasonable value for those services;

(z) Obtain such insurance as necessary to insure the acts and conduct of the Receiver and those persons who he may employ to carry out the duties voted upon him;

(aa) To borrow and incur unsecured debt in the ordinary course of preserving and liquidating Receivership Property as an administrative expense of the Receiver without further order of this Court;

(bb)    To borrow and incur secured debt in the ordinary course of preserving and liquidating Receivership Property, with liens attaching to sale proceeds of Receivership Property on a super-priority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Plaintiff; and (ii) to the extent such secured debt is incurred, the Receiver shall provide an account on a monthly basis of amounts incurred;

(cc)    To reimburse the Plaintiff for any amounts advanced pre-Receivership for critical insurance, security, bookkeeping, utilities, and other payments of costs and expenses necessary to maintain and preserve Receivership Property;

(dd)    To obtain appraisals and environmental reports with respect to Receivership Property;

(ee)    To initiate proceedings under chapters 7, 11 12 or 13 of the United States Bankruptcy Code;

(ff)    Generally do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably deems ought to be done, executed, and performed in and about or with respect to the Receivership Property; and

(gg)    Subject to the prior written agreement and consent of the Plaintiff, establish and adopt bidding and auction sale procedures for the sale of Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court.

HUSCH BLACKWELL LLP

*/s/ Christopher C. Miles*
Michael D. Fielding    MO 53124
Christopher C. Miles MO 63654
4801 Main Street, Suite 1000
Kansas City, Missouri  64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
E-mail: michael.fielding@huschblackwell.com
           christopher.miles@huschblackwell.com

*Attorneys for Plaintiff*